UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                 :

GEORGE CAMPBELL                           :   Index No.: 1:16-cv-9734
                                                   :
                            Plaintiff,        :   **COMPLAINT**
                                                     :       **AND**
              – against –              :   **JURY DEMAND**
                                                     :

BANK OF AMERICA, N.A.,               :
                                                   :
                            Defendant.      :
                                                   :
------------------------------------------------------------------ X

      Plaintiff GEORGE CAMPBELL hereby alleges, upon personal knowledge as to himself and upon information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

      1.     Plaintiff George Campbell ("Plaintiff" or "Mr. Campbell") brings this civil action against Defendant Bank of America, N.A. ("Defendant" or "BOFA"), a national bank, for its failure to conduct a good-faith investigation of Plaintiff's dispute of fraudulent and unauthorized transactions on his BOFA checking and savings accounts, limit Plaintiff's liability for the fraudulent and unauthorized transactions in accordance with applicable law and regulations, provide Plaintiff with an explanation of its findings within three business days after the conclusion of its investigation, provide Plaintiff copies of all documents that BOFA relied on to conclude that there was no error or fraud, and for other misconduct, in violation of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*, and the rules and regulations thereunder; New York General Business Law § 349; and state common law. As a result of Defendant's failure to

comply with its legal obligations, Plaintiff lost thousands of dollars, and was effectively forced

out of the mainstream banking system by Defendant's negative reporting of Plaintiff to a

consumer reporting agency.

2.      Plaintiff seeks damages, along with injunctive relief, reasonable costs, and

attorney's fees.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over Plaintiff's claim pursuant to 15 U.S.C. §

1693m(g) and 28 U.S.C. § 1331. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201

and 2202. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to

28 U.S.C. § 1367.

4.      Venue in this district is proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because

BOFA does business in this district, in part through its branch located at 301 West 145th Street,

New York, New York, 10039. Venue in this district is also proper under 28 U.S.C. § 1391(b)(2)

because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## PARTIES

5.      Plaintiff George Campbell is a 40-year-old African-American man who lives in

Harlem, in upper Manhattan, supports a son and a young daughter, and is employed as a  full-

time maintenance worker at a shelter in The Bronx.

6.      Plaintiff is a "consumer" as defined by the Electronic Fund Transfer Act, 15

U.S.C. § 1693a(6), because he is a natural person who had an account held by a financial

institution, and who was issued an access device by that financial institution and entered into an

agreement with that financial institution for the provision of electronic fund transfer services.

-2-

7.      Defendant Bank of America, N.A. ("Defendant" or "BOFA") is a national banking association whose principal place of business is located at 100 North Tryon Street, Charlotte, North Carolina 28202. As of June 30, 2016, Defendant had $2.2 trillion in assets; ranked fifth among banks in deposit market share in New York City; and had 124 branches throughout New York City, including a branch at 301 West 145th Street, New York, New York 10039.

8.      Defendant is a "financial institution" as defined by the Electronic Fund Transfer Act, 15 U.S.C. § 1693a(9), because it is a national bank and directly or indirectly holds accounts belonging to consumers or issues an access device and agrees with consumers to provide electronic fund transfer services.

## FACTUAL ALLEGATIONS

### Plaintiff's Facts

#### I.      *Plaintiff's BOFA Account History*

9.      Plaintiff George Campbell is a 40-year-old African-American man who lives in Harlem, in upper Manhattan, and supports a son and a young daughter. Mr. Campbell works full-time as a maintenance worker at a shelter in The Bronx.

10.      Mr. Campbell opened a BOFA checking account, a BOFA savings account, and a BOFA secured credit card in or around November 2015. He held the BOFA checking and savings accounts until BOFA closed his accounts in January 2016. Upon information and belief, BOFA closed his secured credit card account in July 2016.

11.      From the opening of his BOFA accounts in November 2015 through December 16, 2015, there were no transactions on the accounts that Mr. Campbell did not recognize.

During this time, all the transactions that Mr. Campbell performed on his BOFA accounts took place in Manhattan – mostly in Harlem – or The Bronx.

12.     Following the last authorized transaction that occurred on December 14, 2015, Mr. Campbell's BOFA checking account had a balance of $1,921.57, and his BOFA savings account had a balance of $1,800.15.

13.     Mr. Campbell always kept his BOFA ATM/debit card in his wallet, and always kept his wallet in his pocket or in another safe place. He never told anyone the Personal Identification Number (PIN) associated with his ATM/debit card. Because he did not use his ATM/debit card frequently and worried that he would have trouble remembering the PIN, he wrote it down on the back of the card.

14.     On or around December 24, 2015, Mr. Campbell took out his wallet to use his BOFA ATM/debit card, but realized that it was not in his wallet. That same day, he called BOFA, reported that his ATM/debit card was missing, reviewed the recent transactions on his account, and disputed the transactions that he did not recognize and had not authorized.

## II.     *Fraudulent Transactions on Plaintiff's BOFA Accounts*

15.     With the exception of weekly preauthorized electronic payments to the same payee, all of the transactions that took place on Mr. Campbell's checking and savings accounts after December 16, 2015 were fraudulent and unauthorized, or consisted of fees that BOFA charged to Mr. Campbell as a result of the fraudulent and unauthorized account activity.

16.     Between December 17, 2015 and December 23, 2015, an unknown fraudster (or fraudsters) executed more than 20 fraudulent transactions on Mr. Campbell's checking and savings accounts without his knowledge or consent, including:

a.  Three unauthorized transfers, totaling $2,000.00, from Mr. Campbell's savings account to his checking account;

b.  15 unauthorized ATM withdrawals, totaling $3,850.99, from Mr. Campbell's checking account, all via ATMS in Brooklyn;

c.  Seven unauthorized deposits of fraudulent checks, totaling $2,903.95, into Mr. Campbell's checking account, all via ATMs in Brooklyn; and

d.  Three unauthorized balance inquiries, resulting in fees totaling $7.50, all via ATMs or other locations in Brooklyn.

17.  All of the unauthorized ATM withdrawals, deposits of fraudulent checks, and unauthorized balance inquiries took place at ATMs in Brooklyn, and in a very concentrated timeframe and sometimes clustered at a single location. For example:

a.  On December 22, 2015 alone, there were eight unauthorized withdrawals totaling $2,412.99, all via four different ATMs in Brooklyn.

b.  The next day, on December 23, 2015, there were seven fraudulent check deposits totaling $2,903.95, all via the same BOFA ATM in Brooklyn.

c.  That same day, on December 23, 2015, there were five separate withdrawals totaling $1,315, all via the same non-BOFA ATM in Brooklyn.

18.  However, Mr. Campbell has not been to Brooklyn, much less used any ATMs in Brooklyn, since 2012. At the time of the fraud, he lived, worked, and attended school in Manhattan, where he still lives.

19.  Nor had Mr. Campbell ever deposited any checks into his BOFA checking or savings accounts.

-5-

20.     These fraudulent and unauthorized transactions triggered at least 19 fees charged by BOFA against Mr. Campbell's checking account (one additional fee was inexplicably refunded), totaling $224.00, including non-BOFA ATM withdrawal fees, returned item fees, and an extended overdrawn balance fee.

21.     The fraudulent and unauthorized transactions and BOFA's fees completely drained Mr. Campbell's checking and savings accounts, causing him to lose at least $3,921.57, and bringing his checking account to a negative balance of -$188.42.

22.     This negative balance of -$188.42 consisted entirely of fees that BOFA charged to Mr. Campbell as a result of the fraudulent and unauthorized transactions.

23.     BOFA therefore did not lose any money to the fraud on Mr. Campbell's BOFA accounts.

24.     Mr. Campbell did not authorize, consent to, participate in, or benefit in any way from this fraud, which resulted in his losing nearly $4,000 of his own money.

*25.*     The following chart lists the fraudulent, unauthorized transactions and resulting fees that posted to Mr. Campbell's BOFA checking account between December 17, 2015 and January 5, 2016:

### *Transactions on Mr. Campbell's BOFA Checking Account 12/17/15 – 01/05/16*

| Transaction Date | Credits | Debits | Account Balance | Transaction Description | Location |
|---|---|---|---|---|---|
| 12/14/15 | --- | --- | $1,921.57 | Balance (no change until 12/17/15) | N/A |
| 12/17/15 | $1,700.00 | $0.00 | $3,621.57 | Unauthorized transfer from savings to checking | N/A |
| 12/17/15 | $100.00 | $0.00 | $3,721.57 | Unauthorized transfer from | N/A |

| | | | | | |
|---|---|---|---|---|---|
| | | | | savings to checking | |
| 12/17/15 | $0.00 | -$3,600.00 | $121.57 | Unauthorized payment to prepaid credit card | N/A |
| 12/18/15 | $0.00 | -$103.00 | $18.57 | Unauthorized withdrawal | "Rockaway P Brooklyn" |
| 12/18/15 | $0.00 | -$250.04 | -$231.47 | Preauthorized debit | N/A |
| 12/18/15 | $0.00 | -$35.00 | -$266.47 | Returned Item Fee for returned preauthorized debit | N/A |
| 12/18/15 | $0.00 | -$2.50 | -$268.97 | Fee for unauthorized balance inquiry | 632 Gateway Dr. in Brooklyn |
| 12/18/15 | $0.00 | -$2.50 | -$271.47 | Fee for unauthorized withdrawal at non-BOFA ATM | "Rockaway P Brooklyn" |
| 12/21/15 | $250.00 | $0.00 | -$21.43 | Return of 12/18/15 preauthorized debit | N/A |
| 12/21/15 | $3,600.00 | $0.00 | $3,578.57 | BOFA "Paymnt Rfd" (reversing 12/17/15 unauthorized payment to secured credit card) | N/A |
| 12/22/15 | $200.00 | $0.00 | $3,778.57 | Unauthorized transfer from savings to checking | N/A |
| 12/22/15 | $0.00 | -$303.00 | $3,475.57 | Unauthorized withdrawal at non-BOFA ATM | 86 E. 98th St. in Brooklyn |
| 12/22/15 | $0.00 | -$503.00 | $2972.57 | Unauthorized withdrawal at non-BOFA ATM | 86 E. 98th St. in Brooklyn |
| 12/22/15 | $0.00 | -$100.99 | $2,871.58 | Unauthorized withdrawal at non-BOFA ATM | 2 Sutter Ave. in Brooklyn |
| 12/22/15 | $0.00 | -$803.00 | $2,068.58 | Unauthorized withdrawal at non-BOFA ATM | 1987 Flatbush Ave. in Brooklyn |
| 12/22/15 | $0.00 | -$303.00 | $1,765.58 | Unauthorized withdrawal at non-BOFA ATM | 1987 Flatbush Ave. in Brooklyn |
| 12/22/15 | $0.00 | -$100.00 | $1,665.58 | Unauthorized | 243 Flatbush |

| | | | | | |
|---|---|---|---|---|---|
| | | | | withdrawal at BOFA ATM | Ave. in Brooklyn |
| 12/22/15 | $0.00 | -$200.00 | $1,465.58 | Unauthorized withdrawal at BOFA ATM | 243 Flatbush Ave. in Brooklyn |
| 12/22/15 | $0.00 | -$100.00 | $1,365.58 | Unauthorized withdrawal at BOFA ATM | 243 Flatbush Ave. in Brooklyn |
| 12/22/15 | $0.00 | -$2.50 | $1,363.08 | Fee for unauthorized balance inquiry at non-BOFA ATM | 1111 Rutland Road in Brooklyn |
| 12/22/15 | $0.00 | -$2.50 | $1,360.58 | Fee for unauthorized balance inquiry at non-BOFA ATM | 86 E. 98th St. in Brooklyn |
| 12/22/15 | $0.00 | -$2.50 | $1,358.08 | Fee for unauthorized withdrawal at non-BOFA ATM | 2 Sutter Ave. in Brooklyn |
| 12/22/15 | $0.00 | -$2.50 | $1,355.58 | Fee for unauthorized withdrawal at non-BOFA ATM | 86 E. 98th St. in Brooklyn |
| 12/22/15 | $0.00 | -$2.50 | $1,353.08 | Fee for unauthorized withdrawal at non-BOFA ATM | 86 E. 98th St. in Brooklyn |
| 12/22/15 | $0.00 | -$2.50 | $1,350.58 | Fee for unauthorized withdrawal at non-BOFA ATM | 1987 Flatbush Ave. in Brooklyn |
| 12/22/15 | $0.00 | -$2.50 | $1,348.08 | Fee for unauthorized withdrawal at non-BOFA ATM | 1987 Flatbush Ave. in Brooklyn |
| 12/23/15 | $462.24 | $0.00 | $1,810.32 | Fraudulent check deposit at BOFA ATM | Gateway Center in Brooklyn |
| 12/23/15 | $459.84 | $0.00 | $2,270.16 | Fraudulent check deposit at BOFA ATM | Gateway Center in Brooklyn |
| 12/23/15 | $446.18 | $0.00 | $2,716.34 | Fraudulent check deposit at BOFA ATM | Gateway Center in Brooklyn |
| 12/23/15 | $433.98 | $0.00 | $3,150.32 | Fraudulent check deposit at BOFA ATM | Gateway Center in Brooklyn |
| 12/23/15 | $423.34 | $0.00 | $3,573.66 | Fraudulent check deposit at BOFA | Gateway Center in Brooklyn |

| | | | | | |
|---|---|---|---|---|---|
| | | | | ATM | |
| 12/23/15 | $350.13 | $0.00 | $3,923.79 | Fraudulent check deposit at BOFA ATM | Gateway Center in Brooklyn |
| 12/23/15 | $328.24 | $0.00 | $4,252.03 | Fraudulent check deposit at BOFA ATM | Gateway Center in Brooklyn |
| 12/23/15 | $0.00 | -$303.00 | $3,949.03 | Unauthorized withdrawal at non-BOFA ATM | 86 E. 98th St. in Brooklyn |
| 12/23/15 | $0.00 | -$303.00 | $3,646.03 | Unauthorized withdrawal at non-BOFA ATM | 86 E. 98th St. in Brooklyn |
| 12/23/15 | $0.00 | -$303.00 | $3,343.03 | Unauthorized withdrawal at non-BOFA ATM | 86 E. 98th St. in Brooklyn |
| 12/23/15 | $0.00 | -$303.00 | $3,040.03 | Unauthorized withdrawal at non-BOFA ATM | 86 E. 98th St. in Brooklyn |
| 12/23/15 | $0.00 | -$103.00 | $2,937.03 | Unauthorized withdrawal at non-BOFA ATM | 86 E. 98th St. in Brooklyn |
| 12/23/15 | $0.00 | -$20.00 | $2,917.03 | Unauthorized withdrawal at BOFA ATM | Eastern Parkway & U in Brooklyn |
| 12/23/15 | $0.00 | -$250.04 | $2,666.99 | Preauthorized debit | N/A |
| 12/23/15 | $0.00 | -$35.00 | $2,631.99 | Returned item fee for returned preauthorized debit | N/A |
| 12/23/15 | $0.00 | -$2.50 | $2,629.49 | Fee for unauthorized non-BOFA ATM withdrawal | 86 E. 98th St. in Brooklyn |
| 12/23/15 | $0.00 | -$2.50 | $2,626.99 | Fee for unauthorized non-BOFA ATM withdrawal | 86 E. 98th St. in Brooklyn |
| 12/23/15 | $0.00 | -$2.50 | $2,624.49 | Fee for unauthorized non-BOFA ATM withdrawal | 86 E. 98th St. in Brooklyn |
| 12/23/15 | $0.00 | -$2.50 | $2,621.99 | Fee for unauthorized non-BOFA ATM withdrawal | 86 E. 98th St. in Brooklyn |
| 12/23/15 | $0.00 | -$2.50 | $2,619.49 | Fee for unauthorized non-BOFA ATM | 86 E. 98th St. in Brooklyn |

|  |  |  |  | withdrawal | N/A |
| 12/24/15 | $250.04 | $0.00 | $2,869.53 | Return of 12/23/15 preauthorized debit | N/A |
| 12/28/15 | $0.00 | -$250.04 | $2,619.49 | Preauthorized debit | N/A |
| 12/28/15 | $0.00 | -$35.00 | $2,584.49 | Returned item fee for returned preauthorized debit | N/A |
| 12/29/15 | $250.04 | $0.00 | $2,834.53 | Return of 12/28/15 preauthorized debit | N/A |
| 12/29/15 | $0.00 | -$2,903.95 | -$69.42 | Return of 12/23/15 fraudulent checks | N/A |
| 12/29/15 | $0.00 | -$84.00 | -$153.42 | Returned item fee | N/A |
| 12/30/15 | $35.00 | $0.00 | -$118.42 | Refund of fee | N/A |
| 01/04/16 | $0.00 | -$250.04 | -$368.46 | Preauthorized debit | N/A |
| 01/04/16 | $0.00 | -$35.00 | -$403.46 | Returned item fee for returned preauthorized debit | NA |
| 01/05/16 | $0.00 | -$250.04 | -$153.42 | Return of 01/04/16 preauthorized debit | N/A |
| 01/05/16 | $0.00 | -$35.00 | -$188.42 | Extended overdrawn balance charge | N/A |

26.     Because of the total depletion of funds from his checking and savings accounts, Mr. Campbell had difficulty paying his bills, including utility and phone bills; was forced to forgo a 13th birthday party that he had promised his daughter; and was unable to buy Christmas presents that he had promised to relatives. He also had to borrow money from relatives and friends – some of whom he is still paying back – to pay utility bills and other expenses.

27.     Mr. Campbell's daughter was upset that she could not have her 13th birthday party as promised, which in turn upset Mr. Campbell.

28.     Mr. Campbell also felt depressed, anxious, and stressed about having to borrow money from others, and about not being able to take care of his responsibilities on his own.

-10-

Because he was reluctant to show others how he was feeling, he sometimes isolated himself from relatives and friends.

29.     BOFA closed Mr. Campbell's checking and savings accounts in January 2016.

30.     At around this time, a BOFA employee also told Mr. Campbell that because BOFA had found that no fraud occurred on his accounts, he would not be able to bank anywhere else.

31.     On or around March 9, 2016, BOFA negatively reported Mr. Campbell to ChexSystems, an agency that reports customers' banking behavior as reported by banks, for "suspected fraud activity." Upon information and belief, BOFA also negatively reported Mr. Campbell to Early Warning Services, a similar type of consumer reporting agency.

32.     Because BOFA negatively reported him to ChexSystems, and possibly other consumer reporting agencies, and because a BOFA employee had told him that he would not be able to bank anywhere else, Mr. Campbell worried that he would be rejected if he tried to open a bank account at another bank.

33.     Since BOFA closed his accounts in January 2016, Mr. Campbell has used check cashers and prepaid credit cards, which cost him a significant amount of money in fees every month. He currently uses a prepaid debit card to receive his wages by direct deposit, and estimates that he pays about $30-40 in fees every month to use his prepaid debit card.

34.     Since going through this ordeal, Mr. Campbell has heard stories about other lower-income people of color, having similar problems resolving fraud disputes with their banks.

35.     Upon information and belief, Defendant has a pattern and practice of representing to certain consumers, especially lower-income customers, that Defendant has conducted a good-

faith investigation of their fraud claims, when in fact Defendant has not; and of refusing to limit consumers' liability for fraud.

### III.    *Electronic Fund Transfer Act and Regulation E*

36.    The federal Electronic Fund Transfer Act of 1978 (EFTA), 15 U.S.C. § 1693 *et seq.*, provides "a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems." 15 U.S.C. § 1693(b). Regulation E (Reg. E) is the set of federal regulations whose stated purpose is to carry out the purposes of the EFTA. 12 C.F.R. § 1005 *et seq.*

37.    The EFTA's primary purpose is "the provision of individual consumer rights." 15 U.S.C. § 1693(b).

38.    Under the EFTA, an "unauthorized electronic fund transfer" is "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit", except for an electronic transfer "(A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized, (B) initiated with fraudulent intent by the consumer or any person acting in concert with the consumer, or (C) which constitutes an error committed by a financial institution." 15 U.S.C. § 1693a(12).

39.    An unauthorized electronic fund transfer "includes a transfer initiated by a person who obtained the access device from the consumer through fraud or robbery." Official Interpretations of Reg. E, 12 CFR Pt. 1005, Supp. I, § 1005.2(m)(3), (4).

40.     Reg. E defines "access device" as "a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers." 12 C.F.R. § 1005.2(a)(1). An "access device" is an "accepted access device" when the consumer "requests and receives, or signs, or uses (or authorizes another to use) the access device to transfer money between accounts or to obtain money property, or services […]". 12 C.F.R. § 1005.2(a)(2)(i).

41.     Under the EFTA, a financial institution must follow specific "error resolution" procedures after a consumer disputes an "error," which includes an unauthorized electronic fund transfer. 15 U.S.C. § 1693f(f)(1). The error resolution procedures require that a financial institution "investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." 15 U.S.C. § 1693f(a)(3).

42.     If a financial institution denies a consumer's claim of error, it must explain its findings and, upon the consumer's request, provide the consumer with copies of the documents it relied upon in its investigation to conclude that an error did not occur. 15 U.S.C. § 1693f(d); 12 C.F.R. § 1005.11(d).

43.     If a consumer reports to his financial institution that an unauthorized electronic fund transfer has occurred through use of an access device such as an ATM/debit card, the consumer's liability for the unauthorized transfer is limited to $50 if it is reported to the financial institution within two business days after the consumer learns of the lost or stolen access device. 15 U.S.C. § 1693g(a).

44.   "Negligence by the consumer cannot be used as the basis for imposing greater liability than is permissible under Regulation E. Thus, consumer behavior that may constitute negligence under state law, such as writing the PIN on a debit card or a piece of paper kept with the card, does not affect the consumer's liability for unauthorized transfers." Official Interpretations of Reg. E, 12 CFR Pt. 1005, Supp. I, § 1005.6(b)-2.

45.   "The extent of the consumer's liability is determined *solely* by the consumer's promptness in reporting the loss or theft of an access device." Official Interpretations of Reg. E, 12 CFR Pt. 1005, Supp. I, § 1005.6(b)-3 (emphasis added).

46.   According to the EFTA's legislative history, the limitation on the consumer's liability for unauthorized transfers is "perhaps the most important protection contained in the entire Act."

47.   The liability limitation was a controversial provision, with banks pushing Congress to provide that consumers be held liable for unauthorized transfers if they were "negligent" – for instance, by writing their Personal Identification Number (PIN) on the ATM/debit card or keeping it with their card.

48.   However, in enacting the EFTA, Congress rejected consumers' negligence as a ground for liability.

49.   Upon information and belief, banks nevertheless routinely violate the EFTA and Regulation E by imposing liability on customers, particularly lower-income customers, by claiming or implying that their customers were negligent because their PINs were used to carry out the disputed transactions.

50.     A consumer may recover actual damages, plus an additional sum in the $100-$1,000 range, the costs of the action, and a reasonable attorney's fee, for a bank's violations of the EFTA. 15 U.S.C. § 1693m(a)(1)-(3).

51.     A court may award treble damages if it finds that a financial institution "did not make a good faith investigation of the alleged error," "did not have a reasonable basis for believing that the consumer's account was not in error", or "knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation." 15 U.S.C. § 1693f(e).

### IV.     Office of the Comptroller's EFTA Consumer Compliance Handbook

52.     In August 2014, the Office of the Comptroller of the Currency (OCC) issued a "Comptroller's Handbook" ("OCC's Handbook") concerning consumer compliance and the EFTA.

53.     The OCC's Handbook states, in accordance with the EFTA and Regulation E, "The extent of the consumer's liability is determined solely by the consumer's promptness in notifying the financial institution….*Other factors may not be used as a basis to hold consumers liable.*" (Emphasis added.)

54.     The OCC's Handbook further states:

The OCC is concerned that some institutions may be rejecting claims of unauthorized transactions solely because the customer's ATM card or debit card and PIN were used in the transaction, and the customer supplied no information indicating that the card or PIN was misappropriated. These facts alone may be insufficient to establish that a transaction was authorized because fraudulent means may have been used to obtain the customer's account number, card, or PIN. For instance, the customer may have been a victim of "shoulder surfing," a

-15-

practice used by criminals to obtain account or card numbers or PINs by observing customer transactions. Therefore, *institutions cannot assume that they have satisfied their duty to investigate simply by concluding that the customer's debit card and PIN were used in the transaction at issue. Rather, institutions must take steps to investigate whether there are indications that unauthorized use occurred.*

(Emphasis added.)

55.    The OCC's Handbook further states, "To assist [financial] institutions in complying with EFTA and Regulation E error resolution procedures, the OCC has compiled a list of actions banks may take to help determine whether a transaction was authorized. [Citation omitted.] A reasonable investigation under Regulation E might include review of one or more of the following items:

- Documentation or written, signed statements provided by the customer.

- Historical information on the customer's pattern of use (e.g., time, frequency, location, and types and amounts of transactions).

- Location of the transaction in relation to the customer's residence, place of business, or normal shopping locations.

- Problems reported by other customers regarding the access device or ATM.

- Signature information on POS [point-of-sale] transactions.

- Police reports, if available.

- Film from security cameras, if available."

### V.    BOFA Deposit Account Agreement

56.    Upon information and belief, the deposit account agreement that applied to Mr. Campbell's BOFA checking and savings accounts states, in accordance with the EFTA and Reg.

E, "If you tell us within two business days after you learn of the loss or theft of your card or code, you can lose no more than $50 if someone uses your card without your permission."

## VI.     Plaintiff's Disputes and Defendant's Responses

57.     As stated above, Mr. Campbell first realized on December 24, 2015 that his BOFA ATM/debit card was missing. That same day, he called BOFA, reported that his ATM/debit card was missing, reviewed the recent transactions on his account, and disputed the transactions that he did not recognize and had not authorized. A BOFA employee gave Mr. Campbell the BOFA claim number 151224102454.

58.     Mr. Campbell soon received a one-page letter from BOFA dated December 28, 2015.

59.     There were just three calendar days – and no business days – between Mr. Campbell's December 24, 2015 dispute and BOFA's December 28, 2015 response: Friday, December 25, 2015 – Christmas Day – and a weekend.

60.     BOFA's December 28, 2015 letter stated, "We've completed our review of this claim and have determined that no error has occurred." The letter further stated, "Our records show the transaction activity in question was authorized and posted correctly to your account." The letter provided no explanation for BOFA's determinations that no error had occurred and that "the transaction activity in question" was authorized and posted correctly to Mr. Campbell's account.

61.     Mr. Campbell then received another letter from BOFA, dated December 29, 2015, notifying him that the seven checks deposited into his checking account on December 23, 2015 had "been returned unpaid," – i.e., had bounced.

62.     On or around January 2, 2016, Mr. Campbell went to a BOFA branch located at 301 West 145th Street in Manhattan to request that BOFA reinvestigate his fraud claim. He spoke to a BOFA employee, who initially told him that she would return his money. However, after consulting another BOFA employee, she told Mr. Campbell that she could not return his money, but would reinstate his fraud claim for further investigation.

63.     Mr. Campbell also asked this same BOFA employee if it would help if he obtained a police report, and she said that sounded like a good idea.

64.     Throughout the month of January 2016, Mr. Campbell made no fewer than four separate attempts, at three different New York City police precincts, to file a police report about the fraud on his BOFA accounts. Each time the police refused, sometimes on the basis that the bank's investigation was still pending.

65.     Meanwhile, Mr. Campbell was working full-time and attending school at night.

66.     Mr. Campbell also asked BOFA to look at any surveillance footage that it might have of the fraudulent activity. Upon information and belief, BOFA did not do so.

67.     In mid- to late January 2016, Mr. Campbell received another one-page letter from BOFA, dated January 14, 2016, stating, "We've completed an additional review of your case and concluded that our original decision was correct." The letter further stated, "No posting error has occurred on your account."

68.     Around this time, Mr. Campbell also obtained from BOFA copies of the fraudulent checks deposited into his checking account. All seven fraudulent checks purport to be drawn on a Wells Fargo account belonging to "The Sports Authority" and bear Mr. Campbell's name and address.

69.     Remarkably, the supposed payer's signature on the front of each of the seven "Sports Authority" checks bears an exact resemblance to the signature of none other than U.S. President Barack Obama.

70.     Meanwhile, the signature endorsement on the back of the checks bears no resemblance whatsoever to Mr. Campbell's actual signature.

71.     Mr. Campbell has never worked for or received any checks from "The Sports Authority."

72.     Having failed to obtain resolution of his fraud claim from BOFA, Mr. Campbell began seeking help from legal services organizations in New York City. Eventually, New Economy Project, a small nonprofit advocacy organization in New York City and one of the legal offices representing him in the instant lawsuit, agreed to look into his fraud claim.

73.     On August 10, 2016, after extensive conversations with Mr. Campbell and review of his documents, New Economy Project sent a dispute letter to BOFA, along with a copy to the Consumer Financial Protection Bureau, on his behalf. The letter described in detail the fraudulent and unauthorized transactions on Mr. Campbell's BOFA accounts, his previous disputes to BOFA, his four attempts to file a police report, and BOFA's lack of compliance with the federal Electronic Fund Transfer Act and Regulation E. The letter also requested copies of any documentation that BOFA relied on to reach its determination that "no error has occurred."

74.     BOFA responded with a letter dated September 7, 2016, confirming that it was adhering to its original decision, stating that Mr. Campbell's ATM/debit card had his Personal Identification Number (PIN) written on it, and stating – for the first time – that its grounds for denying Mr. Campbell's fraud claim were that:

a.  The checks in question showed Mr. Campbell's correct address, and "there is no obvious answer to the question of how a wrongdoer would know that information"; and

b.  BOFA's fraud detection unit had detected "unusual" activity on Mr. Campbell's checking account and, on December 22, 2015, blocked further use of his ATM/debit card, but within 30 minutes of placing the block, the fraud detection unit received a call from someone who claimed to be Mr. Campbell and requested that the block be lifted, upon which BOFA lifted the block.

75.    In this same letter, BOFA claimed that because of the above two factors, BOFA "required very little time to conduct its investigation and deny the claim."

76.    Mr. Campbell did not provide his address to whoever perpetrated the fraud on his accounts.

77.    BOFA claims that "there is no obvious answer to the question of how a wrongdoer would know" Mr. Campbell's address. However, Mr. Campbell had his New York State driver's license and his medical appointment card, both of which bear his address, in his wallet alongside his ATM/debit card when it was stolen.

78.    Mr. Campbell also did not call BOFA on December 22, 2015. Until December 24, 2015, he was not even aware that his ATM/debit card was missing, or that there were fraudulent and unauthorized transactions on his BOFA accounts.

79.    Incredibly, when Mr. Campbell *did* call BOFA on December 24, 2015 to report that his ATM/debit card was missing, BOFA did not so much as even mention the call that had allegedly taken place two days earlier.

80.     Upon information and belief, BOFA is well aware that theft of bank customers' ATM/debit cards and/or card numbers and PINs, as well as other sensitive customer data, is unfortunately a common phenomenon.

81.     One example is BOFA's own experience in or around 2011, when it was reported that a BOFA employee had stolen customer data including "names, addresses, social security numbers, driver's license numbers, birth dates, email addresses, mother's maiden names, PINs and account balances" (http://www.americanbanker.com/bulletins/breach_data_insider_fraud-1038203-1.html).

82.     The massive fraud recently revealed by government authorities to have been perpetrated at Wells Fargo, involving fraudulently opened accounts and unauthorized transactions on those accounts, is another example of blatant misuse of customer data that is clearly beyond an innocent customer's control.

83.     Theft of bank customer data also occurs through data breaches at businesses, including large retailers. The New York State Office of the Attorney General reported that more than 900 businesses experienced data breaches of customer information in 2013. The most publicized example, the computer security breach at Target in late 2013, reportedly compromised the PINs and security codes of 40 million credit and debit card accounts.

84.     Other criminal means of obtaining bank customers' PINs have been widely reported. In addition to the "shoulder surfing" method referred to by the OCC and data breaches, criminals have reportedly been able to obtain ATM/debit card and PIN information through "skimming," where thieves steal account number and PINs using remote devices, or through

thermal imaging technology, which enables thieves to capture the heat registered on a keypad

after someone enters his or her PIN.

85.     Unlike credit card fraud, ATM/debit card fraud means that money is immediately

missing from the bank customer's account – and is often in the hands of an unknown fraudster.

Upon information and belief, whereas banks can readily shift the loss to a known third party

(such as the merchant) in the case of credit card fraud, with ATM/debit card fraud banks cannot

as readily shift the loss to a third party – *i.e.*, the fraudster, whose identity is often unknown.

Upon information and belief, in flagrant violation of the EFTA and Regulation E, banks

therefore routinely compel certain customers, particularly lower-income customers, to bear the

full brunt of the loss.

86.     Upon information and belief, BOFA did not conduct a good-faith investigation of

Mr. Campbell's fraud claim, although federal law and regulations require that BOFA do so, and

although BOFA was in the best position to obtain and review information regarding the disputed

transactions on Mr. Campbell's accounts.

87.     At no time during its supposed investigation did BOFA ask Mr. Campbell to

complete any kind of affidavit regarding his stolen ATM/debit card or fraud claim or to obtain a

police report. In fact, as stated above, Mr. Campbell was the one who suggested to a BOFA

employee that he try to obtain a police report.

88.     Upon information and belief, BOFA either did not review a sample of Mr.

Campbell's actual signature – *e.g.*, from documents that Mr. Campbell likely signed upon

opening his BOFA checking and savings accounts and secured credit card – or ignored the fact

that Mr. Campbell's actual signature bears no resemblance whatsoever to the forged endorsement on the fraudulent checks deposited into his account on December 23, 2015.

89.     Upon information and belief, BOFA either did not review Mr. Campbell's pattern of use – *e.g.*, time, frequency, location, and types and amounts of transactions – on his BOFA checking and savings accounts, or ignored the fact that Mr. Campbell's pattern of use showed, for example, only transactions in Harlem, in upper Manhattan, or The Bronx, and no transactions whatsoever in Brooklyn.

90.     Upon information and belief, BOFA did not review any surveillance footage, *e.g.*, from ATM security cameras at the BOFA locations where some of the unauthorized activity took place, though Mr. Campbell specifically asked BOFA to do so.

91.     BOFA has also ignored the fact that the supposed payer's signature on the fraudulent Sports Authority checks bears an exact resemblance to the signature of U.S. President Barack Obama.

92.     On December 5, 2016, Mr. Campbell, by counsel, sent BOFA a demand letter via FedEx Priority Overnight service, again reiterating his grounds for disputing the fraudulent and unauthorized transactions, and requesting that BOFA reimburse him no later than December 12, 2016. The letter informed BOFA that unless it reimbursed Mr. Campbell by that date, Mr. Campbell might be compelled to pursue litigation.

93.     To date, BOFA has not responded.

## FIRST CLAIM FOR RELIEF
(Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*)

94.      Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

95.      This claim arises under the Electronic Fund Transfer Act (EFTA) and Regulation E because it relates to fraudulent and unauthorized electronic fund transfers.

96.      Defendant violated the EFTA and Regulation E. Defendant's violations include, but are not limited to the following:

      a.   Failing to limit Plaintiff's liability for the fraudulent and unauthorized electronic fund transfers in accordance with the EFTA and Regulation E;

      b.   Failing to conduct a good-faith investigation of Plaintiff's claims of error or fraud claim;

      c.   Failing to provide Plaintiff, within three business days after the conclusion of Defendant's investigation of Plaintiff's initial fraud claim, with an explanation for Defendant's findings;

      d.   Failing to return improperly withheld account funds associated with Plaintiff's fraud claims; and,

      e.   Failing to provide Plaintiff with copies of documentation that Defendant relied on to reach its determination that there was no error or fraud, after Plaintiff requested the same.

97.      These actions are in violation of 15 U.S.C. §§ 1693f and 1693g and 12 C.F.R. §§ 1005.6 and 1005.11.

-24-

98.     As a direct and proximate result of Defendant's violations of the EFTA and Regulation E, Plaintiff has sustained actual damages equal to at least $3,921.57, plus such other damages as may be determined by the court. Plaintiff is entitled to recover actual damages under plus an additional sum of between $100 to $1000, the costs of the action, and a reasonable attorney's fee. 15 U.S.C. § 1693m.

99.     As a direct and proximate result of Defendant's violations of EFTA and Regulation E, Plaintiff suffered compensable harm, including actual damages and emotional distress.

100.    Because Defendant lacked a reasonable basis for denying Plaintiff's fraud claim, Plaintiff is also entitled to recover treble damages, which amount to at least $11,764.71, under § 1693f(e).

## SECOND CLAIM FOR RELIEF
(N.Y. Gen. Bus. Law § 349)

101.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

102.    New York prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state. . . ."  N.Y. Gen. Bus. Law § 349(a).

103.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(h).

104.    Defendant violated § 349 of the New York General Business Law by using deceptive acts and practices in the conduct of its business.

105.    Defendant's violations include, but are not limited to:

a.    Representing to Plaintiff that Defendant had performed a good-faith investigation of his fraud claim, when in fact Defendant did not do so; and

b.    Representing to Plaintiff that Defendant's records show that the transactions in question were in fact authorized and not fraudulent, when in fact their records indicate numerous and obvious signs of fraudulent activity.

106.    Defendant's conduct has a broad impact on consumers at large.

107.    Upon information and belief, Defendant's conduct is directed toward consumers at large.

108.    Upon information and belief, Defendant has a pattern and practice of representing to consumers that Defendant has conducted a good-faith investigation of their fraud claims, when in fact Defendant has not; and of refusing to limit consumers' liability for fraud.

109.    As a direct and proximate result of Defendant's violations of § 349 of the New York General Business Law, Plaintiff has sustained actual damages in an amount to be proved at trial and is also entitled to punitive damages, injunctive relief, costs and attorney's fees.

### THIRD CLAIM FOR RELIEF
(Unjust Enrichment)

110.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

111.    Defendant has been unjustly enriched and benefited from the inequitable acts alleged in this Complaint, by its failure to exempt Plaintiff from liability for fraudulent and unauthorized activity on his accounts.

112.    Defendant has reaped profits and revenues resulting from its unlawful conduct.

113.    It would be inequitable to allow Defendant to retain any of the proceeds derived from its unlawful conduct.

114.    Defendant should be compelled to disgorge all proceeds received by it for the unlawful acts described in this Complaint, which have inured and continue to inure to its unjust enrichment.

## FOURTH CLAIM FOR RELIEF
(Breach of Contract)

115.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

116.    Upon information and belief, Defendant entered with Plaintiff into a standard deposit account agreement that governed the terms of Plaintiff's bank accounts.

117.    Upon information and belief, the deposit account agreement provided that consumers will not be held liable for unauthorized electronic fund transfers.

118.    Upon information and belief, Defendant breached this contract by holding Plaintiff liable for the fraudulent transfers and withdrawals made by an unknown fraudster or fraudsters misusing his BOFA accounts.

119.     As a result of Defendant's unlawful actions, Plaintiff incurred damages in an amount to be determined at trial, amounting to at least $3,921.57 in financial losses, plus such other damages as may be determined by the court.

## FIFTH CLAIM FOR RELIEF
(Breach of Duty of Good Faith and Fair Dealing)

120.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

121.     Section 1-203 of New York State's Uniform Commercial Code imposes an obligation of good faith in the performance of any contract.

122.     Section 4-103 of New York State's Uniform Commercial Code further states that no bank may disclaim responsibility for its own lack of good faith or failure to exercise ordinary care in the performance of its obligations.

123.     Furthermore, New York law provides that all contracts contain an implied covenant of good faith and fair dealing in the course of performance.

124.     Defendant breached this duty, and indeed acted in bad faith, by holding Plaintiff liable for the fraudulent and unauthorized ATM deposits and ATM withdrawals performed on Plaintiff's accounts, as well as for the resulting fees.

125.     As a result of Defendant's breach of the duty of good faith and fair dealing, Plaintiff is entitled to damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
(Negligence)

126.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

127.    Defendant owed Plaintiff, its customer, a duty of ordinary care.

128.    Defendant's breaches of this duty include, but are not limited to:

   a.   Failing to sufficiently authenticate the identity of the person who Defendant claims called Defendant on December 22, 2015 purporting to be Plaintiff;

   b.   Lifting a block against further activity on Plaintiff's accounts and thereby allowing additional fraudulent and unauthorized transactions on Plaintiff's accounts;

   c.   Failing to block the fraudulent and unauthorized transactions that took place the day after Defendant lifted the block against further activity on Plaintiff's accounts;

   d.   Failing to verify the signature endorsement on the seven fraudulent checks deposited into Plaintiff's BOFA checking account; and

   e.   Failing to exercise ordinary care in training and supervising its employees on its responsibilities under the Electronic Fund Transfer Act and Regulation E.

129.    As a direct and proximate result of Defendant's breach of this duty, Plaintiff suffered compensable harm, including actual damages and emotional distress.

130.    As a result, Plaintiff is entitled to actual damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.      Enter judgment for Plaintiff on all causes of action;

2.      Enter an injunction requiring Defendant to comply with the Electronic Fund Transfer Act and Regulation E, and to train its employees accordingly;

3.      Enter an injunction requiring Defendant to cease and desist from pursuing, or to correct, negative action against Plaintiff, including its negative reporting to consumer reporting agencies, as a result of its own failures to comply with the Electronic Fund Transfer Act, Regulation E, and its own deposit account agreement;

4.      Award actual, statutory, consequential, and punitive damages to Plaintiff;

5.      Award reasonable attorney's fees and costs to Plaintiff; and,

6.      Award such other and further relief as may be just, equitable, and proper.


**JURY TRIAL DEMANDED.**

Dated: New York, New York          Respectfully submitted,
          December 16, 2016

                                        __/s/ Susan Shin_____
                                        By: Susan Shin
                                        New Economy Project
                                        121 West 27th Street, Suite 804
                                        New York, New York 10001
                                        212-680-5100

                                        Brian L. Bromberg
                                        Bromberg Law Office, P.C.
                                        Standard Oil Building
                                        26 Broadway, 21st Floor
                                        New York, New York 10004
                                        212-248-7906

                                        *Attorneys for Plaintiff*

-30-